Filed 8/19/24  In re J.J. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | C099227 |
| THE PEOPLE, | (Super. Ct. No. JV139889) |
| Plaintiff and Respondent, | |
| v. | |
| J.J., | |
| Defendant and Appellant. | |

J.J. appeals the juvenile court's determination that he was not amenable to rehabilitation while under the jurisdiction of the juvenile court, as well as the subsequent transfer of two of the cases against him to a court of criminal jurisdiction.  (Welf. & Inst.[1]

---

[1]     Undesignated section references are to the Welfare and Institutions Code.

Code, § 707.)  He argues on appeal:  (1) that changes brought about by Senate Bill No. 545 (2023-2024 Reg. Sess.) (Senate Bill No. 545) require remand for a new amenability determination, and (2) that insufficient evidence supports the juvenile court's determination that he could not be rehabilitated before expiration of the juvenile court's jurisdiction.  We will affirm.

BACKGROUND

A.    *The Transfer of Jurisdiction from Dependency and J.J.'s Treatment Out of State*

On February 14, 2019, the People filed a juvenile wardship petition (§ 602) alleging that on or about February 12, 2019, J.J. committed two counts of misdemeanor battery (Pen. Code, § 242).  J.J. and another minor pushed staff at the Children's Receiving Home, and J.J. punched a peer in the face.  The juvenile court detained him and ordered an assessment to determine whether J.J. should be treated as a dependent or a ward of the court.  (§ 241.1.)

The section 241.1 report recommended a dependency petition, in light of the minor's history of severe physical abuse and childhood trauma, resulting in maladaptive coping skills making him impulsive and quick to react.  This was J.J.'s first wardship petition, although he had been accused of touching female students inappropriately and threatening to take another student's "virginity for his birthday" in Kansas in 2017.  J.J. had been living with his father in Kansas for several years but ran away when visiting his mother in Sacramento in the summer of 2018 and was unsupervised in Monterey, California, until January 2019.  J.J. asked not to return to his father, who he claimed was physically abusive.

On March 11, 2019, the juvenile court modified J.J.'s custody order so that he would be released to the Sacramento Department of Child, Family, and Adult Services (child protective services) after a suitable placement was located.  A plan to release J.J. to his father at the airport on April 4, 2019, failed when J.J. refused to speak with his father,

2

and his father subsequently refused to take custody of him.  J.J. was then transported back to juvenile hall.

On April 16, 2019, J.J. was placed at the Paradise Oaks group home.  The next day, he ran away and a warrant was issued for his arrest.

On July 9, 2019, the People filed a wardship petition alleging that on or about July 6, 2019, J.J. committed attempted carjacking (Pen. Code, §§ 664/215, subd. (a); count one) with a firearm enhancement (Pen. Code, § 12022.53, subd. (b)); assault with a firearm (Pen. Code, § 245, subd. (a)(2); count two) with a firearm enhancement (Pen. Code, § 12022.5, subd. (a)); robbery (Pen. Code, § 211; count three) with a firearm enhancement (Pen. Code, § 12022.53, subd. (b)); carjacking (Pen. Code, § 215, subd. (a); count four) with a firearm enhancement (Pen. Code, § 12022.53, subd. (b)); receiving a stolen vehicle (Pen. Code, § 496d, subd. (a); count five); possession of stolen property (Pen. Code, § 496, subd. (a); count six); and false identification to a police officer (Pen. Code, § 148.9, subd. (a); count seven).  While multiple minors participated in the crimes, both victims identified J.J. as the individual wielding the handgun, which he used to hit one victim on the head; he threatened to shoot the other victim in the head if she did not exit the car.  J.J. admitted gang association.  He was detained on July 10, 2019, and the juvenile court ordered an updated section 241.1 assessment.

The supplemental section 241.1 assessment filed July 22, 2019, recommended J.J. be treated as a delinquent within the juvenile justice system in light of:  (1) his running away from his safe placement within 24 hours of arriving, (2) the criminal sophistication and seriousness of the pending allegations — which represented an escalation of his criminal behavior and placed J.J. and the community at large in grave danger, and (3) J.J.'s failure to attend school and otherwise accept help from child protective services.

On August 22, 2019, the juvenile court ordered a referral to the interagency placement committee to obtain a recommendation for an appropriate placement with consideration of the People's pending settlement offer, resulting in a recommendation for

a level B placement at the Summit Academy in Pennsylvania, in light of the seriousness of the allegations against J.J. and the failure of in-state treatment placements in the past. The committee concluded that "[p]lacement at Summit Academy will provide the minor with the intensive structure and supervision he currently requires, along with the individualized treatment, including drug treatment, educational programming that will assist him in meeting his placement and rehabilitative goals."

On October 8, 2019, the juvenile court adopted the joint recommendation that J.J. be treated within the delinquency system. The original February 14, 2019, and July 9, 2019 wardship petitions were then dismissed as superseded by the People's second amended petition for wardship, and J.J. resolved the amended petition the same day by admitting to having committed robbery with a firearm enhancement. The remaining counts were dismissed in the interest of justice, in light of the admission but with consideration. J.J. was adjudged a ward of the court (§ 602), placed on probation under specified terms and conditions, and ordered placed at Summit Academy. Placement occurred on November 7, 2019.

Aside from absconding from the program in December 2019 for a few hours, J.J. responded positively to his placement at Summit Academy. J.J. participated in educational programming, weekly counseling, cognitive behavioral therapy, substance abuse sessions, aggression replacement training, a gun and violence education program, life skills training, and victim awareness intended to help J.J. learn "pro-social behaviors, positive coping skills and problem-solving strategies." He was diagnosed with posttraumatic stress disorder, attention deficit hyperactivity disorder, and cannabis use disorder. He also participated in the program's industrial arts segment, learning automotive detailing and cabinetmaking/millwork. J.J. graduated from the program in May 2020 and was then reunified with his father in Kansas in accordance with his case plan.

B.    *Events Following J.J.'s Completion of Out-of-State Treatment*

Less than two weeks after being reunified with his father, J.J. violated his probation by running away from his father's home in Kansas in the early morning hours of June 3, 2020.  J.J. was unhappy with his father's house rules, wanted to socialize with a bad crowd, and ultimately returned to Sacramento despite his probation officer's warning that doing so would be a violation of his probation.  J.J. was booked into Sacramento County's juvenile hall on June 16, 2020, admitted the probation violation on September 14, 2020, and was released the same day to his father with the understanding that he would live with an extended family member, N.U.[2]

Approximately one month later, on October 18, 2020, J.J. allegedly shot J.P. in the head, killing him.  On October 21, 2020, before police became aware of his involvement in the death of J.P., J.J. was taken into custody for possession of a firearm by a minor (Pen. Code, § 29820, subd. (b)) and obstructing a peace officer (Pen. Code, § 148, subd. (a)(1)).  J.J. was at a known gang residence during a probation search and fled through bushes and over a fence after officers contacted other individuals at the residence.  Officers instructed J.J. to stop and then heard a metallic thud coming from his direction.  A loaded black handgun was found in a black bag within feet of J.J.  J.J. admitted gang association.  The People filed a petition alleging J.J. violated his probation by failing to obey all laws, and the juvenile court detained him.

On December 8, 2020, J.J.'s attorney indicated J.J. intended to go to trial on the probation violation, and the People expressed their intention to seek a department of juvenile justice commitment in light of J.J.'s completion of a level B placement followed by his possession of a gun while in the presence of gang members showing the danger he

---

[2]    To protect their privacy, we refer to this person and victims by their initials.  (Cal. Rules of Court, rule 8.90(b)(4), (11).)

5

posed to the community. The same day, J.J. was released on electronic monitoring to N.U. over the People's objections.

On February 5, 2021, the juvenile court denied J.J.'s motion to modify his custody status to home supervision in light of his background and the nature of the charge. On February 19, 2021, J.J.'s attorney reported that DNA testing had excluded J.J. as a contributor to the DNA found on the firearm he allegedly possessed, and the juvenile court granted J.J.'s motion to modify his custody status to home supervision, again over the People's objection. The People amended the probation violation to include J.J.'s association with a prohibited person, and J.J. waived time so that his trial would proceed in April before the judge who had been presiding over the proceedings.

Thereafter, on April 1, 2021, the People filed their first motion to transfer J.J. to a court of criminal jurisdiction (§ 707, subd. (a)(1)), alleging J.J. murdered J.P. on or about October 18, 2020 (Pen. Code, § 187, subd. (a); count one) and had personally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)). A witness saw J.J. exit the car he was traveling in and shoot at J.P. multiple times before returning to the same car and leaving with the group. Text messages and J.J.'s Internet search history also implicated him.

At the April 6, 2021, trial readiness conference on the probation violations, the juvenile court directed J.J. to surrender himself to juvenile hall on the murder warrant. J.J. failed to turn himself in and did not appear at his continued trial readiness conference, resulting in a bench warrant for his arrest.

On April 19, 2021, J.J. allegedly robbed and assaulted C.H. Police were not yet aware of J.J.'s alleged crimes against C.H. when J.J. was arrested on the prior bench warrant on April 28, 2021, and transported to juvenile hall. He was officially detained the next day.

On August 13, 2021, the People filed a second petition to transfer J.J. to criminal court (§ 707, subd. (a)), alleging that he was not amenable to treatment within the

6

juvenile court and reciting new crimes against C.H.  Specifically, that on or about April 19, 2021, J.J. committed robbery (Pen. Code, § 211; count one) with great bodily injury (Pen. Code § 12022.7) and personal use of a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)); assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count two) with a great bodily injury enhancement (Pen. Code, § 12022.7); and assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count three) with a great bodily injury enhancement (Pen. Code, § 12022.7).  A witness saw J.J. and another individual beat C.H. with a replica firearm and baseball bat, resulting in a skull fracture and ongoing vision issues.[3]  They then took approximately $4,000 from the victim's residence.  Surveillance video, as well as J.J.'s fingerprints and cell phone pictures further implicated him in the crimes.  J.J. had been in custody since April 28 and was participating in " 'college success' " courses and participating in programming in juvenile hall.  He was officially detained on these allegations on August 16, 2021.

On September 2, 2021, J.J.'s attorney clarified that J.J. had two transfer petitions and one amended petition for violations of probation pending against him.  The matter was then continued multiple times over nearly a year for the preparation of a report by J.J.'s psychological expert[4] and for the consideration of discovery.  J.J. refused to attend many of the hearings on these matters.

In the interim, on July 20, 2022, J.J. waived his right to housing at a youth detention facility and requested a transfer to the county jail pending the section 707 hearing, which was granted the same day.

---

[3]     Victim C.H. died before the section 707 hearing, but it is not believed his death was a result of the April 19, 2021 beating.

[4]     It is not clear whether a report was ever prepared.  No psychological evaluation of J.J. appears in the record.

On September 2, 2022, J.J. entered a general, unlimited time waiver, and the matter was continued.  In January 2023, the matter was referred to the probation department for the preparation of the section 707 report.

C.    *The Section 707 Report and Briefing*

On April 12, 2023, the probation department filed its section 707 report on J.J., who was by then 19 years old.  This report summarized the substantial allegations then pending against him in the People's two section 707 petitions and the facts surrounding them.  The report further summarized J.J.'s prior record and probation's rehabilitative efforts.  As to his social history, J.J. noted that he had been removed by child protective services at age six and again at age 10 because his mother suffered from bipolar disorder and was physically and verbally abusive to J.J. and his siblings.  He was reunified each time his mother completed her services.  J.J. became involved with the Oak Park Blood gang when he was approximately 12 years old, but denied committing any crimes for the gang's benefit.  J.J. and his older brother ran away in 2016, and J.J. eventually moved to Kansas to live with his father where he stayed for approximately two years before returning to Sacramento in the summer of 2018.  J.J. reported that he had posttraumatic stress disorder as a result of his chaotic childhood and the abuse he suffered.  J.J. stated he suffers from "auditory hallucinations," including " 'hear[ing] voices,' "  and had been prescribed Zoloft.  He also engaged in daily marijuana use.  Having denounced his gang affiliation, J.J. was housed in protective custody at the county jail and said he wanted to go to college to become a social worker and help other juveniles.  J.J. reported that he graduated from high school in September 2021.

According to the report, J.J. had two incident reports since being transferred to the county jail:  one for assaulting another inmate and another for failing to follow instructions.  At juvenile hall, J.J. had 31 incident reports generated for a variety of infractions, including attempting to assault staff, threatening staff, failure to follow

8

instructions, physical altercations, and gang agitation. J.J. did participate in programs and services offered at juvenile hall.

The probation department's report then evaluated the section 707, subdivision (a) factors, ultimately recommending a transfer to a court of criminal jurisdiction. First, J.J.'s alleged crimes were criminally sophisticated in that he was not a passive participant, did not appear to be under coercion or duress or otherwise in an altered emotional state, and did not have a history of mental health issues or intellectual disability.[5] Further, despite probation's earlier intervention, J.J.'s crimes had "increased in nature and severity." In light of J.J.'s abusive childhood and the bad neighborhoods in which he grew up, the report acknowledged his "familial and community environment and childhood trauma may have had an effect and impact on [J.J.'s] decision making process regarding his involvement in the pending matter." Nonetheless, the pending offenses "showed significant criminal sophistication" and "given the facts of the offenses, the amount of violence exhibited, and the fatal harm caused to one of the victims [J.J.'s] unstable childhood does not mitigate or warrant his involvement in the pending matter." Thus, this factor favored transfer. (§ 707, subd. (a)(3)(A).)

Second, the report concluded that J.J. could not be rehabilitated before expiration of the juvenile court's jurisdiction. (§ 707, subd. (a)(3)(B).) J.J.'s adjustment to county jail and juvenile hall following his latest arrest was poor, resulting in multiple incident reports. Despite J.J.'s participation in programming, he continued to engage in violent and aggressive behavior. Further, J.J. completed an outpatient program that included "intensive rehabilitation programs and services addressing: peer relations, life skills, aggression, victim awareness, gun and violence education, drug and alcohol use, as well as cognitive behavioral therapy addressing self-change, social skills, and problem solving

---

[5]     The report also highlighted that J.J. expressed the need to " 'lay low' " following the murder to evade law enforcement.

9

skills." Nonetheless, within five months of graduating from that program, J.J. committed the pending offenses, thus showing treatment thus far did not have "a lasting impact on his criminal thinking and behavior." [6]

Third, the report recommended that J.J.'s prior delinquent history, though violent, weighed in favor of the juvenile court retaining jurisdiction because J.J. had suffered a chaotic, unstable childhood during which he had exposure to violent neighborhoods filled with crime, drugs, and criminal street gangs. (§ 707, subd. (a)(3)(C).) The report highlighted this "exposure to violence within his community environment and his childhood trauma may have contributed to this negative peer association and criminal lifestyle [and] may have influenced his decision making."

Fourth, the report found the lack of success in previous attempts to rehabilitate J.J. weighed in favor of transferring the matter to a court of criminal jurisdiction. (§ 707, subd. (a)(3)(D).) J.J. had participated in significant rehabilitative efforts as documented therein, and nonetheless, his "crimes [had] significantly increased in nature and severity." Further, J.J. was placed with his father in Kansas in an attempt to distance him from negative influences, but "shortly upon his arrival to Kansas, [J.J.] fled back to his negative environment and peer associations in Sacramento."

Fifth, the circumstances and gravity of the offenses alleged to have been committed by J.J. weighed in favor of transferring the matter to a court of criminal jurisdiction. (§ 707, subd. (a)(3)(E).) J.J. committed murder with a firearm, assault with a firearm, and robbery with the violent use of weapons, and J.J. was not a passive

---

[6] After this section, the report generically described programming available at Sacramento's Secure Youth Treatment Facility (VOYA), without analyzing whether the facility could rehabilitate J.J. At the contested section 707 hearing, the People sought to clarify that information about the VOYA programming is included in every section 707 report, but is not necessarily applicable in every case. The juvenile court determined that inclusion of this clarification was not needed, although its admission might be appropriate on rebuttal. The People offered no rebuttal.

participant in these crimes, nor acting under duress or other emotional distress. These offenses showed his pattern of using force, violence, and weapons putting himself and the community at risk despite his awareness of the risks and consequences of his criminal behavior. Even taking someone's life did not have an "impact on [J.J.] and/or his thinking and behavior."

On April 20, 2023, the matter was set for a contested section 707 hearing. J.J.'s transfer hearing brief argued that the People could not establish by clear and convincing evidence that J.J. was not amenable to rehabilitation while under the jurisdiction of the juvenile court. Rather, he argued it was clear from the information included in the section 707 assessment that J.J. could be treated at the VOYA facility under the supervision of the juvenile court.

The People disagreed in their briefing, arguing that all five section 707 factors supported transfer. As to the alleged murder, J.J. arrived in a red car, shot J.P. in the head, and then fled in the same car. A few days later, J.J. was arrested for gun possession and a search of his cell phone implicated him in the murder, including that he had disposed of the gun. Further, when authorities attempted to arrest J.J. for the murder, he violently resisted, lunged for a handgun, and once subdued, was found in possession of ammunition. J.J. taunted detectives, yelling, " 'You mother fuckers are lucky! I was gonna kill all you mother fuckers! Ya, bitch, you lucky I didn't get that gun!' "

Regarding the robbery and assault with a deadly weapon that occurred approximately nine days before J.J.'s arrest for the murder, the victim kicked his girlfriend out of his home following an argument. She returned later with J.J. and another individual, who proceeded to punch, kick, and beat and robbed the victim resulting in injuries requiring hospitalization. J.J.'s fingerprints were recovered from a replica AK-47 style pellet gun recovered from the scene with the victim's blood on it. Video surveillance also implicated J.J. in the crime.

11

The People argued these crimes were not impulsive or impetuous, but rather cold and callous showing a high level of criminal sophistication. There was no known motive for the murder, or even evidence that J.J. knew the victim. Further, as J.J. fled in the car, he threatened other occupants not to say anything and then disposed of the murder weapon. He obtained another gun and tried to dispose of it when he was arrested just days later in the company of other gang members. J.J. took steps to conceal his identity before this attack and armed himself with a realistic looking pellet rifle, thus showing criminal sophistication.

Further, J.J.'s delinquent history started with an assault of the Children's Receiving Home staff in February 2019, and continued with a carjacking, attempted carjacking, and robbery in July 2019. While in juvenile hall, J.J. accumulated multiple incident reports for mutual combat, disrespecting staff, and gang agitation, among others. Because of J.J.'s failure to change with in-state treatment, J.J. was placed for more intensive treatment and structure out of state at Summit Academy in November 2019. This program lasted 24 weeks and was "designed to aid students in making positive decisions when faced with the pressures of street violence, gangs, substance use, and volatile real-life situations." It required students to "to complete written work, participate in discussions, discuss videos related to gun violence, and work with a team to promote prevention and education in their communities." J.J. successfully completed Summit Academy and was reunified with his father in Kansas in May 2020.

Within two weeks of his placement in Kansas, J.J. returned to Sacramento and was arrested for violating his probation. While detained in juvenile hall, J.J. behaved poorly — refusing to go to school, disrespecting staff, and engaging in gang agitation. J.J. admitted violating probation, was released, and within five weeks, murdered J.P. A few days later he was arrested for gun possession at a known gang hangout, resulting in a probation violation petition. He was then involved in an assault on other residents in juvenile hall, gang agitation, and attempted to assault staff who were trying to intervene.

In sum, the People argued, J.J. was given multiple opportunities to change his behavior, but instead manipulated the system to get what he wanted and escalated to more and more extensive and increasingly violent, dangerous conduct weighing in favor of transfer.

The People further argued that it would be impossible to rehabilitate J.J. before jurisdiction ended in the juvenile court because, despite all the rehabilitative efforts, J.J. refused to change for the better and instead only escalated into more dangerous behavior. J.J. completed intensive treatment at Summit Academy in Pennsylvania, but within a short time committed murder, assault with a deadly weapon, and robbery. Moreover, J.J.'s behavior in custody deteriorated despite his participation in rehabilitative programs. Because J.J.'s negative behavior escalated in the community and in a structured environment despite his treatment, the People posited he could not be rehabilitated before juvenile court jurisdiction expired and should be transferred.

Finally, the People argued the gravity of J.J. personally murdering J.P. by shooting him in the head for no apparent reason underscored the appropriateness of transferring the matter to a court of criminal jurisdiction.

D.    *The Section 707 Hearing and Court's Ruling*

The evidentiary hearing occurred on August 3 and August 4, 2023, with the People presenting 47 exhibits[7] and witness testimony, including victim impact statements. In pertinent part, J.J.'s former placement probation officer testified regarding J.J.'s treatment at Summit Academy and the circumstances surrounding his ultimate violation of probation for running away from his father's home in Kansas within 10 days of placement there.

---

[7]    Included in these exhibits were the discharge summary of programming completed at Summit Academy and behavioral reports concerning J.J.'s poor behavior since his return to juvenile hall in June 2023.

13

Further, Sergeant George Parsons who worked at the county jail testified, validating body camera footage showing J.J. requesting to be moved to the general population, specifically the 200 POD (a part of the jail that would be safe in light of his gang affiliation). The People also presented the testimony of several probation officers who supervised J.J. in juvenile hall before his transfer to county jail. These officers relayed J.J.'s frustration with juvenile hall phones, that he had been combative and noncompliant, and that he had, on multiple occasions, threatened assaults on staff to facilitate his move to county jail. J.J. was also written up for offering information on hidden contraband in exchange for commissary and peer agitation. No expert testimony on the amenability of J.J. to treatment within the juvenile court's jurisdiction was offered.

In support of his opposition, J.J. filed supplemental exhibits comprised of letters of reference from family, friends, and the Gang Awareness & Prevention director requesting J.J. stay in juvenile court as well as certificates of completion showing J.J.'s various accomplishments. J.J. also presented the testimony of Jennifer P.,[8] J.J.'s aunt, that he had had a "tumultuous" childhood with multiple instances of interventions by child protective services and time spent living "in the projects" as well as group homes. Jennifer P. opined that J.J. had recently changed, had a new sense of direction away from the street life, and had matured over his 830 days of incarceration. Jennifer P. maintained that view even after being informed that J.J. had assaulted a minor in juvenile hall on June 27, 2023, and had threatened to assault juvenile hall staff in July 2023. The court then heard the arguments of the parties and took the matter under submission.

Thereafter on August 9, 2023, the juvenile court provided a written ruling to counsel and summarized its decision to transfer the matter to criminal court — midway through that recitation, J.J. left the courtroom. In light of J.J.'s arguments on appeal, we

---

[8]     To protect her privacy, we refer to this person by her first name and last initial. (Cal. Rules of Court, rule 8.90(b)(11).)

14

recount substantial portions of the court's written ruling.  It stated in pertinent part:  "The Court finds that, considering all five statutory criteria together, Petitioner proved by clear and convincing evidence that [J.J.] is not amenable to rehabilitation while under the jurisdiction of the juvenile court.  Therefore, the transfer motion is granted."

"The Court considered the statements from the family of [J.P.]; the testimony of Youth Detention Facility and County Jail staff; Petitioner's Motion to Transfer and supporting exhibits; Defense Transfer Brief and supplemental supporting exhibits and the Social Study Report filed on April 12, 2012, and argument by counsel."

"*Circumstances and Gravity of Offense*

"The Court finds that this criterion favors transfer.

"[J.J.] is alleged to have murdered [J.P.]  There was no connection between [J.J.] and the victim.  [J.J.] was not a passive participant in the offense.  Without any provocation or words exchanged, he got out of a car and fired multiple shots including one which struck the victim in the head.  [J.J.] showed no regard for human life and no remorse for his actions.  He boasted about committing 'Redrum' and shared news coverage of the victim's death with his girlfriend.

"Within six months after [J.P.] was murdered, [J.J.] is alleged to have armed himself with a realistic looking rif[l]e and assaulted and robbed [C.H.].  [J.J.] was not a passive participant in this incident which caused the victim to suffer, among other things, a skull fracture and related impaired vision.

"The nature, severity, circumstances, gravity and impact of the offenses favor transfer.

"*The Degree of Criminal Sophistication Exhibited by the Minor*

"[J.J.'s] behavior and conduct surrounding the alleged offenses demonstrates criminal sophistication.  The evidence indicated he appreciated the risks and consequences of his actions.  [J.J.] expressed the need to hide evidence and lay low.  There is no evidence of any meaningful empathy or remorse.  He was not a passive

15

participant in the alleged criminal conduct and there was nothing noted in the offense reports to indicate he was under coercion or duress.  Moreover, there was nothing notable about [J.J.'s] physical, mental, or emotional state at the time of the alleged offenses.  According to Probation records, [J.J.] did not have a history of physical or mental health issues and his school records do not describe diminished intellectual capacity.

"The Court finds that this factor favors transfer.

"*The Minor's Previous Delinquent History*

"[J.J.'s] delinquent history began at age 14 and has subsequently escalated in violence and dangerousness.

"He was first arrested and detained in juvenile hall for committing battery against other residents of his group home.  While on an abscond, he terrorized three different victims in three different incidents within hours of each other.  During the final incident, [J.J] was holding a gun at his side and threatened to blow the victim's head off if she didn't give him her car.

"Resolution of these incidents in juvenile court included a commitment level B placement at Summit Academy in Pennsylvania.  Within two weeks of successful discharge and placement with his father in Kansas, [J.J.] tired of his father's efforts to provide structure and discipline and absconded to Sacramento.  After spending three months in juvenile hall related to his violation of probation, he was released to a family member and is alleged to have committed murder.  Within six months, he is alleged to have committed the violent assault and robbery against [C.H.].

"The extensive and violent delinquent conduct supports transfer.

"*Success of Previous Attempts by the Juvenile Court to Rehabilitate the Minor*

"[J.J.] has been afforded multiple interventions and opportunities to benefit from a range of rehabilitative programs and settings.  None of these efforts, including out of state placement, away from negative influences, in a setting with intensive therapeutic services, have been successful.  Remarkably, at his own request, [J.J.] was transferred

16

from the youth detention facility, and away from its rehabilitative programming so that he could be detained in County Jail in a setting with individuals with similar gang affiliation.

"The record does reflect a chaotic and unstable childhood with instances of abuse and trauma. [J.J.'s] family has an extensive history with [child protective services]. [J.J.] himself described the neighborhoods he grew up in as violent where he witnessed crime, drugs and criminal street gangs. He became involved in a criminal street gang when he was just 12 years old.

"Clearly, [J.J.'s] childhood trauma may have had an effect and impact on his decision-making process. However, the record also reflects substantial efforts by his family and the probation department to put him on a positive path. The record does not indicate [J.J.] is an individual who lacks intelligence or ability to comply with rules, but rather that [J.J.] is someone who is capable of complying with rules to get what he wants. Unfortunately, when he is in the community, [J.J.'s] conduct demonstrates that, at least for now, he has chosen to live by a set of values and rules other than those reflected in our laws. Rather than move him in a positive direction, his conduct reflects movement in the opposite direction notwithstanding the years of rehabilitative efforts.

"As these prior attempts have failed, in part because [J.J.] rejects them, this factor favors transfer."

*"Whether the Minor can be Rehabilitated Prior to the Expiration of the Juvenile Court's Jurisdiction*

"[J.J.] has been in custody for over 800 days. While at the Youth Detention Facility, he has participated in program and services focused on strengthening pro-social skills, confidence building, problem solving, decision making, abilities, life skills, and anti-gang violence. Despite these opportunities, he has failed to demonstrate meaningful growth and maturity. He has continued his violent and aggressive behavior while detained at the Youth Detention Facility and the County Jail.

17

"[J.J.] was previously afforded the opportunity to participate in intensive rehabilitative programs at the Summit Academy in Pennsylvania. These programs and services addressed: peer relations, life skills, aggression, victim awareness, gun and violence education, drug and alcohol use. Additional programming applied cognitive behavioral therapy techniques to address self-change, social skills, and problem-solving skills. The pending offense[s] were committed less than six months after this intensive programming.

"The intensive efforts to provide rehabilitative programming have not changed [J.J.'s] negative trajectory. There was nothing in the record, or in his demeanor during the hearing, which suggests any recent changes that might suggest he is amenable to rehabilitation.

"This factor favors transfer.

"Considering the totality of the factors in Welfare & Institutions Code section 707[, subdivision] (a)(2)(A-E), and for the reasons stated above, the Court finds that Petitioner has met its burden of proof by clear and convincing evidence and grants Petitioner's motion to transfer [J.J.] to criminal court."

In light of this determination, the section 707 petitions filed on April 1, 2021, and August 13, 2021, were dismissed as superseded by adult complaints, Sacramento County Superior Court cases numbers 23FE00082 and 23FE00083, and the pending probation violations were dismissed in the interests of justice. J.J. timely appealed.

DISCUSSION

J.J. challenges the juvenile court's transfer order on two grounds. First, he argues that changes brought about by Senate Bill No. 545 require remand for a new amenability determination. Second, he posits that insufficient evidence supports the juvenile court's determination that he was not amenable to rehabilitation due to the lack of expert testimony on the subject, as well as the lack of evidence concerning his treatment needs,

18

programs available to meet those needs, and whether rehabilitation could be achieved before the expiration of the juvenile court's jurisdiction. We are unpersuaded.

A.      *Legal Background*

Section 707 governs the procedure for transferring an individual who committed a crime as a minor from juvenile to criminal court. "It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).) Following the filing of the motion, the probation department prepares "a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).)

"The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, Assembly Bill [No.] 2361 amended section 707[, subdivision] (a)(3) by adding the following italicized language: 'Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.*' (§ 707[, subd.] (a)(3), italics added.)" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

"The five statutory criteria listed in subparagraphs (A) through (E) of section 707[, subdivision] (a)(3) were not amended by Assembly Bill [No.] 2361. Those criteria are (1) 'the degree of criminal sophistication exhibited by the minor' (§ 707,

19

subd. (a)(3)(A)(i)), (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' (§ 707[, subd.] (a)(3)(B)(i)), (3) '[t]he minor's previous delinquent history' (§ 707, subd. (a)(3)(C)(i)), (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' (§ 707, subd. (a)(3)(D)(i)), and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' (§ 707, subd. (a)(3)(E)(i)). The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" (*Miguel R*., *supra*, 100 Cal.App.5th at p. 164.) These criteria "are based on the premise that the minor did, in fact, commit the offense." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 682.)

"Effective January 1, 2024, Senate Bill No. 545 amended section 707 to require that with respect to each of those five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) The previous version of the statute made consideration of those factors discretionary, not mandatory. (Former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" (*Miguel R*., *supra*, 100 Cal.App.5th at pp. 164-165.)

Changes also were made to the factors to be considered when determining a minor's degree of criminal sophistication. (*Miguel R*., *supra*, 100 Cal.App.5th at p. 165.) Specifically, when the juvenile court made its determination in this case, section 707, subdivision (a)(3)(A)(ii) instructed the court to consider "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma." (Former § 707, subd. (a)(3)(A)(ii).) Under Senate Bill No. 545, "childhood trauma" has been replaced with "the existence of childhood trauma; the minor's involvement in the

20

child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (Stats. 2023 ch. 716 § 1; *Miguel R.*, at p. 165.)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. (*People v. Superior Court* (*Jones*), [*supra*,] 18 Cal.4th at p. 680.) 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.) The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. (*Superior Court* (*Jones*), at pp. 682-683.) In conducting a substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' (§ 707[, subd.] (a)(3).) Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.)

B.    *Senate Bill No. 565 does not require Remand*

J.J. argues this court must reverse and remand for a new amenability determination in light of the changes brought about by Senate Bill No. 545. While we agree that Senate Bill No. 565 applies retroactively (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 169-170), we are unpersuaded this relief is warranted.

21

First, the record clearly demonstrates that the juvenile court considered all five section 707, subdivision (a)(3) criteria together when determining whether J.J. would be amenable to rehabilitation while under the jurisdiction of the juvenile court. Thus, J.J. has failed to show the juvenile court did not consider all factors as required by Senate Bill No. 565's amendment. (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164-165.)

Further, we are unpersuaded that remand is required to allow the juvenile court to consider J.J.'s " 'involvement in the child welfare or foster care system and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery.' "[9] J.J.'s history within child protective services, the challenging neighborhoods of his youth, and their potential impact on J.J.'s "decision making process" were discussed within the probation department's section 707 report and highlighted within that report's discussion of J.J.'s criminal sophistication and his prior delinquent history. J.J.'s aunt testified on his behalf regarding his tumultuous childhood at the section 707 hearing, and his counsel argued that his "family and community environment and childhood trauma" were all relevant to the court's decision, that he had been led down a bad path, and showed he was capable of treatment within the juvenile system.

Within the context of this evidence and argument, the juvenile court's written ruling recognized: "[t]he record does reflect a chaotic and unstable childhood with instances of abuse and trauma. [J.J.'s] family has an extensive history with [child protective services]. [J.J.] himself described the neighborhoods he grew up in as violent where he witnessed crime, drugs and criminal street gangs. He became involved in a criminal street gang when he was just 12 years old. [¶] Clearly, [J.J.'s] childhood trauma may have had an effect and impact on his decision-making process." Nonetheless, the court found this history was countered by unsuccessful "substantial efforts by his family

---

[9]     There is no suggestion J.J. was a victim of human trafficking, sexual abuse, or sexual battery, and thus, we will focus on his history of child welfare and foster care.

and the probation department to put him on a positive path" and that J.J. had instead "move[d] in the opposite direction notwithstanding the years of rehabilitative efforts." Therefore, it is clear that the juvenile court already considered J.J.'s history within the child welfare and foster care systems,[10] such that it is not reasonably probable that remand for reconsideration of J.J.'s criminal sophistication in light of Senate Bill No. 565 amendments would yield a different result. (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 170-171.)

C.      *Substantial Evidence Supports the Juvenile Court's Section 707,*

        *Subdivision (a)(3)(B) Determination*

J.J. finally argues that insufficient evidence supports the juvenile court's determination that he was not amenable to rehabilitation given the absence of expert testimony on the subject, as well as the lack of evidence concerning his treatment needs, programs available to meet those needs, and whether rehabilitation could be achieved before juvenile court jurisdiction expired. J.J.'s argument focuses solely on the purported lack of evidence under section 707, subdivision (a)(3)(B)(i); we therefore limit our analysis to that prong as well. Having done so, we find substantial evidence supports the juvenile court's determination.

Here, as set forth at length, *ante*, the juvenile court determined the evidence had established that despite intensive rehabilitative efforts, including J.J.'s over 800 days in custody, he continued in a negative trajectory with no suggestion that he would be amendable to rehabilitation within the juvenile justice system, thus favoring transfer.

---

[10]      We acknowledge the court's written discussion of these issues occurred within its analysis of the success of prior rehabilitative efforts; however, given that the juvenile court considered all factors together when making its determination, we remain persuaded that, even if this information were considered specifically in connection with the criminal sophistication factor, it is not reasonably probable that a different outcome would result. (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 170-171.)

23

Section 707, subdivision (a)(3)(B)(i)-(ii) advises that when determining "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction [¶] . . . the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature."

At the outset, while expert testimony is helpful in evaluating this factor, J.J. has not established that expert testimony is *required* prior to the juvenile court determining an individual cannot be rehabilitated prior to the expiration of the juvenile court's jurisdiction. (See, e.g., *In re S.S.* (2023) 89 Cal.App.5th 1277, 1286, 1288.) Rather, this section recognizes the juvenile court may consider any relevant information, including "the minor's potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).)

Relevant to that potential, we find substantial evidence supporting the juvenile court's determination that despite intensive efforts to rehabilitate J.J., he continued in a negative trajectory showing he was not amenable to rehabilitation. For example, the probation department's section 707 report noted probation's earlier interventions had not resulted in positive change. J.J. had adjusted poorly to juvenile hall and county jail (including violent and aggressive behavior), in spite of J.J.'s extensive treatment and participation in programming within the juvenile hall. Moreover, despite J.J.'s completion of a program that included "intensive rehabilitation programs and services addressing: peer relations, life skills, aggression, victim awareness, gun and violence education, drug and alcohol use, as well as cognitive behavioral therapy addressing self-change, social skills, and problem solving skills," J.J. committed murder, assault with a deadly weapon, and robbery within months of graduation, thus showing his treatment did not have "a lasting impact on his criminal thinking and behavior."

Relevant to that thinking and as highlighted by the People's section 707 brief, J.J. committed premeditated, unprovoked murder, and when arrested on the murder allegation, J.J. taunted detectives that they were lucky he had not been able to reach his gun and that he had intended to kill them. Before he had been arrested for the murder,

but after learning that he was wanted for murder, J.J. committed a planned and unprovoked robbery and assault with a deadly weapon showing a cold and callous advanced criminal sophistication.  Thus, despite the many rehabilitative efforts expended on J.J., he refused to change for the better and instead only escalated into more dangerous behavior.  Most recently, J.J. threatened and manipulated jail staff to obtain a transfer to the main county jail and demonstrated a willingness to work the system when in his favor, but without genuine change or remorse of any kind.  Further, because J.J.'s negative behavior escalated in the community and in a structured environment despite his treatment, the People posited he could not be rehabilitated before the expiration of the juvenile court's jurisdiction.  In support of this conclusion, the People presented evidence at the section 707 hearing of J.J.'s poor behavior, request to be housed with other gang members at the county jail, and manipulation of jail staff.  The People also presented evidence that J.J. had assaulted other residents since his return to juvenile hall.

Against this evidence concerning J.J.'s previous treatment and its ineffectiveness despite the successful completion of substantial programming, the juvenile court determined he was not amenable to rehabilitation.  J.J. faults this determination for lack of evidence specific to "J.J.'s rehabilitative needs" and whether "they could not be met within the juvenile court's jurisdiction."  While expert testimony specific to these topics might be helpful, we cannot find that the juvenile court's determination that he was not amenable to rehabilitation is unsupported by substantial evidence.  It is the abundant evidence concerning his previous treatment completed in the face of continued and escalating criminality that distinguishes this matter from other authorities.  (See *In re S.S., supra*, 89 Cal.App.5th at pp. 1290-1291; *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 195-201.)

## DISPOSITION

The judgment is affirmed.

\s\
Krause, J.

We concur:

\s\
Renner, Acting P. J.

\s\
Mesiwala, J.